# In the United States Court of Federal Claims

<table>
<tr><td>

ACCELGOV, LLC,

       *Plaintiff,*

v.

THE UNITED STATES,

       *Defendant,*

and

ARGUS SECURE TECHNOLOGY LLC,

       *Defendant-Intervenor.*

</td><td>

No. 25-1678[1]
(Filed: March 17, 2026)
Filed under seal: February 24, 2026
Reissued: March 17, 2026

</td></tr>
</table>

*W. Brad English, Emily J. Clancey, Taylor R. Holt, & Hunter M. Drake*, Maynard Nexsen, PC, Huntsville, AL, for Plaintiff.

*Vijaya Surampudi*, Civil Division, U.S. Department of Justice, Washington, D.C., and *Wilmary Bernal & Michael Janson*, Office of General Counsel, U.S. Federal Communications Commission, Washington, D.C., for Defendant.

*Robert J. Sneckenberg & James G. Peyster*, Crowell & Moring LLP, Washington, D.C., for Defendant-Intervenor.

**OPINION AND ORDER**

**LERNER,** *Judge.*

## I.    Introduction

Plaintiff AccelGov, LLC ("AccelGov") brings this post-award bid protest challenging a contract award by the U.S. Federal Communications Commission ("FCC" or "Agency") to Defendant-Intervenor Argus Secure Technology LLC ("Argus") for Cybersecurity Support Services.  Am. Compl. ¶¶ 1–3, 21–35, ECF No. 37.  Plaintiff moved for a preliminary injunction, and after consolidating briefing on that motion with the merits, the parties filed cross-motions for judgment on the administrative record.  ECF Nos. 3, 29, 36, 38, & 39.  The FCC found Plaintiff's proposal of [***] Information System Security Officers ("ISSOs") to be a "severe

---

[1] This Opinion was filed under seal on February 24, 2026.  ECF No. 55.  The parties jointly proposed redactions.  ECF No. 57.  Accordingly, the Court reissues this Opinion with the agreed upon redactions, which are noted with bracketed asterisks ([***]).

underestimation of the resource allocation required for this contract." Tab 50 at Admin. R. ("AR") 2773. Because Plaintiff fails to show that the Agency impermissibly weighed this finding or that the best-value analysis was flawed, its Motion for Judgment on the Administrative Record is **DENIED**, and Defendant's and Defendant-Intervenor's Cross-Motions for Judgment on the Administrative Record are **GRANTED**.

## II.   Background

### A.   Solicitation

On July 29, 2025, the FCC issued Request for Quotations ("RFQ" or "Solicitation") No. 273FCC25Q0012 pursuant to Federal Acquisition Regulations ("FAR") Subpart 8.4. Tab 9 at AR 69, 124. The Solicitation sought Cybersecurity Support Services ("CSS") for the FCC Office of the Chief Information Officer from small-business bidders holding contracts under the General Service Administration's ("GSA's") Highly Adaptive Cybersecurity Services Multiple Award Schedule. Tab 19c at AR 343; Tab 32a at AR 542. The deadline for proposals was August 27, 2025. Tab 32a at AR 543.

The primary objective was to "transition the FCC from a traditional Cybersecurity Service model to a Managed Cybersecurity Services model to safeguard the FCC's critical information infrastructure." Tab 19c at AR 343. The winning bidder would need to (1) reduce exposure to cyber risk; (2) ensure priority response and recovery to cyber threats/incidents; (3) maintain shared situational awareness of cyber threats, vulnerabilities, and incidents; and (4) use trustworthy cyber protocols, products, services, configurations, and architectures. *Id*. The FCC planned to award a firm fixed price task order on a best value basis, with a six-month base period, four twelve-month optional periods, and one six-month optional period. *Id.* at AR 344; Tab 32a at AR 542.

The RFQ was a consolidation of two prior contracts with the FCC: the Network Security Operations Contract and the Security Program Support Contract. Decl. of FCC Chief Information Security Officer Christopher S. Webber ("Webber Decl.") ¶ 5, ECF No. 24-2. The consolidated CSS Contract ("Contract") added new "mission critical cybersecurity initiatives" such as a round-the-clock Security Operations Center and penetration systems, "[***]." *Id.* ¶ 9. These expanded services allow the Agency to search for "[***]." *Id*. The Contract also addresses new risks from artificial intelligence ("AI") software and provides cybersecurity support for four vendors who operate in a quasi-government capacity on behalf of the FCC. *Id.* ¶ 10.

The Solicitation's Performance Work Statement ("PWS") required the contractor to perform seven major task areas "at a minimum": (1) Program Management and Control; (2) Security Operation Center Services; (3) Risk and Vulnerability Assessment; (4) Cybersecurity Architecture, Engineering, Operations, and Maintenance; (5) Governance and Risk Management (optional for base period); (6) Cybersecurity Assurance (optional for base period); and (7) Cybersecurity Critical Incident Support (optional). Tab 19c at AR 344. The Solicitation advised that the contractor "must maintain a sufficient staff and coverage on a continuous basis,

includ[ing] uninterrupted 24x7x365 day support for all tasks identified in this PWS . . . . Maintaining a reliable, stable workforce is essential to consistent coverage, and the fulfillment of all tasks under the contract." *Id*. at 346.

At issue in this protest are staffing proposals for work falling under Task Areas 1, 2, and 6. For Task Area 1, Program Management and Control, the PWS asked bidders to provide a staffing plan including a "highly qualified team" who "must be available 24/7/365, to address any requirements or emergencies, including cyber events, thereby maximizing the FCC's value." *Id.* at 354. Bidders were also required to provide a "Continuous Monitoring Strategy" for "continuous monitoring and compliance management to ensure the integrity and security of IT systems." *Id*.

Under Task Area 2, Security Operation Center Services, the PWS required "Incident Assessment and Response Support." *Id.* at 360–61. The FCC expected the winning contractor to "work with the [Office of the Chief Information Officer] and any other pertinent parties (including external vendors) at any FCC location to recover from any incident. . . . Any incident requiring a response team to respond is expected to be able to respond within 15 minutes of notification." *Id.* at 360. This work would "be done in coordination with external service providers, FCC system owners, system administrators, and Information System Security Officers (ISSOs), as appropriate." *Id*. The PWS did not explicitly label the title for this role, but in evaluations, the Agency referred to the role as an Incident Response Analyst, or "IR Analyst." *See* Tab 69 (Contracting Officer Award Decision Memo) at AR 2984–85, 2989, 2993.

Task Area 6, the Cybersecurity Assurance program, "maintains and manages the security posture of each IT system within defined portfolios." Tab 19c at AR 370. As part of this program, the contractor would provide myriad services, including "IT FISMA System Portfolio Management" and "Cybersecurity Risk Management & Planning." *Id*. Risk management included a "Risk Management Framework (RMF)," which "promotes the concept of near real-time risk management and ongoing information system authorization through the implementation of continuous monitoring processes." *Id*.

The contractor was required to provide ISSOs "with the knowledge, skills, abilities, staff support, and other related resources necessary to conduct the following RMF related services: Prepare [the FCC to manage its security and privacy risks]; Categorize Information Systems; Select Security Controls; Implement Security Controls; Authorize Information System[s]; Monitor Security Controls"; and "Other RMF Related Services." *Id.* at 371. A separate subsection of Cybersecurity Assurance, titled "Information Security System Officer (ISSO)," listed the following eleven ISSO responsibilities:

- Serve as primary liaise between the FCC Cybersecurity Group, Information System Owner (SO), Enterprise Common Control Provider (ECCP), and Information Owner for coordination and dissemination of information on technical security and risk-related matters.

3

- Verify applications and support systems are meeting information security policies, including continuous vulnerability scans, patch management, and configuration management.
- Ensure compliance with requirements concerning the use of commercial and open-source software through the FCC OCIO Governance Boards.
- Assist with reporting and investigating information security incidents to the Cybersecurity Group Security Operations Center (SOC) and gather pertinent information or provide requested services in support of incident handling.
- Identify the security categorization and control selection of the information system to determine the potential adverse impact in the event of a security breach following the established methodology for execution of these activities, stipulated in the FCC's Risk Management Framework Program methodology document.
- Coordinate with stakeholders to document and implement standard controls for existing ECCPs and facilitate discussions with Program Areas to maintain and expand standard control providers, as needed.
- Coordinate Initial Privacy Assessments (IPAs) and Privacy Impact Assessments (PIAs).
- Perform real-time monitoring of assigned information systems through dashboarding capabilities to support continuous monitoring.
- Drafts, reviews, and updates information system continuous monitoring plans based on changes in risk, control selection, laws, executives' orders, and guidelines.
- Review tiered information security reports for the information system and participate in briefings with the system owner, Chief Information Security Officer (CISO), and Authorizing Officials, including the Chief Information Officer (CIO).
- Regularly review the FCC security posture and prepare status update Security Posture Report with adjusted metrics.

*Id.* at 375.

The Solicitation stated that bids "must adhere" to the Federal Information Security Modernization Act of 2014 ("FISMA"), the Government Performance and Results Act of 1993, and the Clinger-Cohen Act of 1996. *Id*. at 377. It also listed applicable standards and restrictions, including the U.S. Office of Management and Budget ("OMB") Circular A-130 and the National Institute of Standards and Technology ("NIST") Special Publication ("SP") 800-30, Revision 1. *Id.*

Bidders asked the Agency to clarify the number of applications "being continuously monitored under the FISMA/RMF guidelines." Tab 19e at AR 399. The FCC responded that "[n]o more than 30 FISMA information system boundaries are expected to be monitored including general support systems (GSSs) and major applications. There are also approximately 30 minor applications - software and services

hosted by or otherwise included in information system boundaries." *Id*. The "system boundary"—interchangeable with the term "authorization boundary"—is discussed by both the NIST and by OMB Circular A-130, which defines it as "[a]ll components of an information system to be authorized for operation by an authorizing official. This excludes separately authorized systems to which the information system is connected." Off. of Mgmt. & Budget, Circular A-130, *Managing Information as a Strategic Resource* 27 (2016); *see also* Nat. Inst. of Standards & Tech., Spec. Publication 800-30 rev. 1 App. B B-6 (2012) (defining "Information System Boundary" as "Authorization Boundary").

### B.    Evaluation and Award

The FCC stated it would award a task order "on a tradeoff, best value basis." Tab 19a at AR 336. The Solicitation listed five evaluation factors: Factor 1—Security Requirements; Factor 2—Technical Approach; Factor 3—Management Approach; Factor 4—Past Performance; and Factor 5—Price. *Id*. at 332–35. The first four factors were considered "technical factors" and listed in descending order of importance. *Id.* at 332. In determining which quote offered the best value, the FCC said it "may make tradeoffs between price and non-price factors." *Id*. at 336. When combined, the technical factors were considered significantly more important than price. *Id.* at 332.

Factor 1 evaluated the offerors' security clearance on a Pass/Fail basis. *Id*. Factor 4, Past Performance, awarded ratings of "Satisfactory Confidence," "No Confidence," or "Unknown Confidence (Neutral)." *Id.* at 335. Factor 2, Technical Approach, and Factor 3, Management Approach, used the following ratings:

> **High Confidence**—The Government has <u>high</u> confidence that the offeror understands the requirement, proposes a sound approach, and will be successful in performing the work with little or no Government intervention.
>
> **Some Confidence**—The Government has <u>some</u> confidence that the offeror understands the requirement, proposes a sound approach, and will be successful in performing the work with some Government intervention.
>
> **Low Confidence**—The Government has <u>low</u> confidence that the offeror understands the requirement, proposes a sound approach, or will be successful in performing the work even with Government intervention.

*Id*. at 332.

The Solicitation stated that "[a]ny subfactor within a specific technical factor are [sic] of equal importance." *Id*. Factor 3, Management Approach, was judged on the management approach for "review and reporting documentation," as well as the following seven subfactors:

> 1. Recruitment and Staffing Plan – The effectiveness of the Offeror's proposed method for recruiting, retaining, and backfilling personnel with sufficient expertise and appropriate certifications (e.g., cybersecurity, Project Management),

including how the Offeror will ensure continuity of operations and minimize service disruption.

2. Resource Allocation – Approach to resource allocation, ensuring that critical functions are always covered, especially during peak times or in emergent situations.

3. Key Personnel – The qualifications, experience, and alignment of proposed key personnel to critical roles necessary to meet the project objectives, including their technical and professional certifications (e.g., cybersecurity, Project Management) relevant to performing tasks [sic] areas under the task order.

4. Organizational Structure – The clarity and appropriateness of the organizational structure, including lines of authority, communication flow, coordination across task areas, and organizational certifications (e.g.[,] CMMI, ISO).

5. Proposed models, processes, tools, and dashboards for achieving efficiencies and improvements in cybersecurity processes, including the use of performance metrics and measures to substantiate claims of enhanced productivity or effectiveness, such as an approach for achieving an effective level in all applicable FISMA metrics.

6. Project management: Approach for aligning project objectives and requirements, including how well the agile implementation roadmap articulates the project's vision, direction, and iterative progress within the proposed Agile framework.

7. Approach for transitioning the FCC from a traditional Cybersecurity Service model to a managed cybersecurity services model that achieves a reduction in exposure to cyber risk; ensures priority response and recovery to cyber threats and incidents; maintains shared situational awareness of cyber threats, vulnerabilities, and incidents; and uses trustworthy cyber protocols, products, services, configurations, and architectures.

*Id.* at 334.

Sixteen bidders submitted timely proposals in response to the Solicitation, including AccelGov. Tab 68 at AR 2967. A Technical Evaluation Team ("TET") conducted technical evaluations of each offer and documented the results in consensus reports alongside a Technical Evaluation Report and Award Recommendation. *Id.* The TET rated the bidders as follows:

| Ranking | Vendor | Factor 1: Facilities Clearance | Factor 2: Technical Approach | Factor 3: Management Approach | Factor 4: Past Performance |
|---|---|---|---|---|---|
| 1 | ▉ | Pass | High | High | Satisfactory |
| | Argus Secure | Pass | High | High | Satisfactory |
| 2 | ▉ | Pass | High | Some | Satisfactory |
| 3 | AccelGov | Pass | High | Low | Satisfactory |
| | ▉ | Pass | High | Low | Satisfactory |
| | | Pass | High | Low | Satisfactory |
| 4 | ▉ | Pass | Some | Low | Satisfactory |
| | | Pass | Some | Low | Satisfactory |
| | | Pass | Some | Low | Satisfactory |
| | | Pass | Some | Low | Satisfactory |
| 5 | ▉ | Pass | Low | Low | Satisfactory |
| 6 | ▉ | Pass | Some | Low | No Confidence |
| | | Pass | High | Low | No Confidence |
| | | Pass | Some | Low | No Confidence |
| | | Pass | Some | Low | No Confidence |
| 7 | ▉ | Fail | Low | Low | No Confidence |

*Id.*

AccelGov placed in the third-ranked tier of proposals, scoring below three other offerors: Argus and [***] ("[***]") in the first tier, and [***] ("[***]") in the second tier. *Id.* In its proposal for Factor 3, AccelGov provided an organizational chart under the "Organization Structure" subfactor. Tab 34a at AR 595. The chart listed only [***] ISSOs under "Cybersecurity Assurance," [***]. *Id.* By contrast, Argus and [***] each proposed [***] ISSOs ([***]), and [***] proposed [***] ISSOs ([***]). *See* Tab 35d at AR 775; Tab 37a at AR 1046; Tab 45b at AR 2110.

Plaintiff received the highest scores in all technical factors except Factor 3, where it earned a Low Confidence Score. Tab 68 at AR 2967. Across the Factor 3 subfactors, AccelGov earned [***] positive confidence findings under "Increases confidence of success" and [***] under "Lower confidence of success." Tab 50 at AR 2772–75. Specifically, the TET concluded that AccelGov's proposal of only [***] ISSOs was insufficient, writing the following under the Resource Allocation subfactor:

> [***] Visual shows only [***] ISSOs. Government believes [***] ISSOs are not sufficient for the 30 FISMA boundaries and 30 minor applications as specified in the solicitation questions and answers question #35. Having only [***] may indicate a drop in quality of the work being performed, and there is not sufficient detail in the offer to explain how the work will be completed. There is no indication in the proposal that would mitigate this, including additional future staffing or a technical solution that would assist with the workload. **This is a severe underestimation of the resource allocation required for this contract.**

*Id.* at 2773 (emphasis in original).

In its award recommendation, the TET explained further:

> The management approach to the AccelGov proposal had a lower confidence of success because it proposed a resource allocation that did not have sufficient resources for the ISSO role in Task Area 6. [***], which may indicate a drop in the quality of work being performed.

Tab 68 at AR 2969.

By contrast, all three of the higher-rated offerors proposed at least [***] full-time ISSOs and [***] for the Cybersecurity Assurance Task Area. Tab 35d at AR 775; Tab 37a at AR 1046; Tab 45b at AR 2110.

Argus earned [***] increased confidence findings and [***] decreased confidence findings across the Factor 3 subfactors. Tab 51 at AR 2784–88. Similar to AccelGov, Argus earned a "Lower Confidence" finding for a staffing shortage under the Resource Allocation subfactor. *Id.* at 2785. However, the TET did not take issue with Argus's number of ISSOs but with its proposal of [***] IR Analysts. *Id.* The Lower Confidence finding states that "[h]aving only [***] analysts for 24x7x365 operations is more likely to reduce the quality of the work being performed and the details in the proposal like cross-training to account for this risk are not sufficient to meet the PWS requirements." *Id.*

However, Argus also earned an increased confidence finding under Resource Allocation, and overall, the TET concluded that this subfactor "neither increases nor lowers confidence in [Argus's] success." *Id.* In the award decision, the Contracting Officer ("CO"), Susan Nicholson, acknowledged this negative finding but affirmed that "this sub-element was not significant enough to lower the rating of the overall factor 3 management approach." Tab 69 at AR 2984.

The following chart summarizes the proposed number of ISSOs and IR Analysts by AccelGov and the three higher-ranked bidders:

| Offeror | Total IR Analysts Proposed | Total ISSOs Proposed |
| --- | --- | --- |
| AccelGov | [***] (Tab 34a at AR 595) | [***] (Tab 34a at AR 595) |
| Argus | [***] (Tab 35d at AR 808) | [***] (Tab 35d at AR 809) |
| [***] | [***] (Tab 37a at AR 1046) | [***] (Tab 37a at AR 1046) |
| [***] | [***] (Tab 45b at AR 2110) | [***] (Tab 45b at AR 2110) |

The tally of confidence findings for AccelGov and Argus across "Review and Reporting" and the seven Factor 3 subfactors is as follows:

| | AccelGov | Argus |
|---|---|---|
| Review and Reporting | 0 findings | 1 lower |
| Recruitment and Staffing Plan | 3 increases | 2 increases |
| Resource Allocation | 2 increases        1 lower | 1 increases        1 lower |
| Key Personnel | 2 increases | 1 increases |
| Organizational Structure | 0 findings | 1 lower |
| Proposed Models, etc. | 1 increases | 4 increases |
| Project Management | 0 findings | 0 findings |
| Approach for Transitioning the FCC | 2 increases | 2 increases |

Tab 50 at AR 2772–75; Tab 51 at AR 2784–88.

In her best value analysis, the CO noted that Argus and [***] each received the highest scores across all technical factors and placed in the highest-ranked group of proposals. Tab 69 at AR 3002. However, Argus bid [***] less than [***] across all options and the six-month extension. *Id.* The CO concluded that with all technical factors "rated the same for [***] and Argus Secure Technology, and after careful examination of the TET consensus reports and Award recommendation, there is no basis for paying a price premium of [***]." *Id.*

The CO then considered [***], which ranked in the second tier. *Id.* She noted that [***] offered a cheaper bid than [***]. *Id.* However, concerns about [***]'s incident response staffing, which would "leverage surge support . . . to maintain full 24/7/365 coverage," earned it a Some Confidence score for Factor 3. *Id.* at 2982, 2986. The CO concluded this weakness could not justify awarding the Contract to [***] over the top-tier bidders:

> [T]he single offeror ranked in #2 poses some risks in their management approach because it proposed a resource allocation for task area 7 and on-call analysts outside of core hours used to meet the task area 2 requirements. This approach was of significant concern and lowered the overall factor 3 because having only [***] on-call person available is likely to worsen cybersecurity processes such as response time to incidents. When price is considered, [***] is [***] higher than Argus Secure and [***] lower than [***]. Having two highest technically [sic] vendors ranked above [***] does not justify awarding to a less technical [sic] favorable offeror.

*Id.*

9

The Contract was awarded to Argus on September 23, 2025.  Tab 71a at AR 3005.

### C.    Procedural History

AccelGov requested post-award briefing from the CO.  Def.'s Mot. for J. on Admin. R. ("Def.'s MJAR") at 12, ECF No. 39.  The CO replied with a brief explanation and a copy of Plaintiff's technical consensus report.  *Id.*  Plaintiff filed its Complaint and a Motion for Preliminary Injunction on October 8, 2025.  Compl, ECF No. 1; Mot. for Prelim. Inj., ECF No. 3.  Argus moved to intervene on the same day, which the Court granted on October 9, 2025. ECF No. 13.

Plaintiff requested consolidation of its Motion for Preliminary Injunction with cross-motions for judgment on the administrative record.  *See* Joint Status Report at 1–2, ECF No. 27.  However, due to an ongoing federal government shutdown, Defendant objected, citing the "extremely limited staffing resources to compile and file even the relevant portions of the whole record."  *Id.* at 4–7.  The Court entered a scheduling order for briefing on the Motion for Preliminary Injunction alone.  ECF No. 16.

On November 13, 2025, after the government shutdown ended, Plaintiff filed a Motion to Consolidate the briefing on a preliminary injunction with the merits, to which Defendant and Defendant-Intervenor took no position.  Mot. to Consolidate at 3, ECF No. 28.  The Court granted the Motion and issued a schedule for the parties' Motions and Cross-Motions for Judgment on the Administrative Record.  ECF No. 29.  Oral argument was held on February 12, 2026.  The motions are fully briefed and ripe for review.  *See* Pl.'s Mot. for J. on Admin. R. ("Pl.'s MJAR"), ECF No. 36; Def.'s MJAR; Def.-Intervenor's Mot. for J. on Admin. R. ("Def.-Int.'s MJAR"), ECF No. 38.

## III.    Jurisdiction and Legal Standards

The U.S. Court of Federal Claims reviews an agency's contract award under the standards set forth in the Administrative Procedure Act ("APA").  28 U.S.C. § 1491(b)(1), (4). The Court determines whether the Government "acted without rational basis or contrary to law when evaluating the bids and awarding the contract."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005).

A bid award may be set aside if either "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Off. Design Grp. v. United States*, 951 F.3d 1366, 1371 (Fed. Cir. 2020) (citation omitted).  To find a rational basis, the Court must determine "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion."  *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (citation omitted).  To establish a procedural violation, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."  *Id*. (citation omitted).

Courts "look for a reasoned analysis or explanation for an agency's decision as a way to determine whether a particular decision is arbitrary, capricious, or an abuse of discretion."

*Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998) (citations omitted). But an "explicit explanation is not necessary . . . where the agency's decisional path is reasonably discernible." *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1315 (Fed. Cir. 2021) (quoting *Wheatland Tube Co.*, 161 F.3d at 1369–70).

"Generally speaking, an agency must evaluate an offeror's proposal based on the criteria set out in the solicitation." *Tetra Tech, Inc. v. United States*, 137 Fed. Cl. 367, 383 (2017). At the same time, "an agency still enjoys 'great discretion in determining the scope of an evaluation factor.'" *Id.* (quoting *Forestry Surveys & Data v. United States*, 44 Fed. Cl. 493, 499 (1999)). "[W]hen weighing the merits of a proposal under a specific evaluation factor, an agency may consider all matters that offerors would reasonably have believed to be within the scope of the factor." *Id.* (quoting *Forestry Surveys & Data*, 44 Fed. Cl. at 497).

In addition to establishing agency error under the APA, a disappointed bidder must demonstrate that it was significantly prejudiced by that error. *Bannum, Inc.*, 404 F.3d at 1351. A bidder is significantly prejudiced if "there was a substantial chance it would have received the contract award but for" the agency's errors. *Id*. at 1353 (citation modified).

## IV.    Discussion

### A.    The FCC Gave Equal Importance to All Subfactors.

AccelGov argues the FCC "deviated from the Solicitation because it did not weigh Factor 3's [subfactors] equally." Pl.'s MJAR at 8–10. It highlights the four subfactors in which it earned only positive findings and points out that even though it earned a negative finding in Resource Allocation, that subfactor also contained [***] positive findings. *Id*. at 9–10. Relying on a mathematical calculation, Plaintiff concludes that "[***] High Confidence [subfactors] averaged with [***] Low Confidence [subfactor] does not equal Low Confidence overall." *Id*. at 10. In fact, Plaintiff argues, these subfactor ratings "could only lead to a High Confidence rating" in Factor 3 overall. *Id.*

But the FCC was not obligated to treat its "increase confidence" or "lower confidence" findings as mathematical pluses and minuses. It is a maxim of federal procurement law that adjectival ratings do not need to "be added up and 'averaged out.'" *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 909 n.6 (Fed. Cir. 2013); *Harmonia Holdings Grp., LLC v. United States*, 167 Fed. Cl. 448, 474 (2023) ("The Court . . . will not engage in calculating an agency rating by counting 'Decreases Confidences,' . . . because this court has rejected such an approach."); *Ft. Carson Supp. Servs. v. United States*, 71 Fed. Cl. 571, 591 (2006) ("The identification of strengths or weaknesses . . . does [not] result in a product that can be mechanically summed or subtracted."). Rather, "the reason that strengths and weaknesses are identified" is not to quantify them but "to help ensure that evaluations are thoughtful." *Ft. Carson Supp. Servs.*, 71 Fed. Cl. at 591; *see also Hyperion, Inc. v. United States*, 92 Fed. Cl. 114, 119 (2010) ("The adjectival ratings are merely a guide.").

This is not to say the Solicitation's statement that all subfactors were of equal importance was without meaning. But while the subfactors were equally important, the underlying

11

adjectival findings could carry different weight. *See Can Softtech, Inc. v. United States*, No. 24-670, 2024 WL 4434253, at \*19 (Fed. Cl. Oct. 4, 2024) ("Procurement law is clear that an agency may choose to attribute different weights to different strengths and weaknesses."); *EFW, Inc. v. United States*, 148 Fed. Cl. 396, 409 ("[C]ommon sense counsels that some strengths are more important, and some weaknesses pose greater risks."). And AccelGov's [\*\*\*] "Lower Confidence" finding under Factor 3 was grave. The FCC considered Plaintiff's proposal of [\*\*\*] ISSOs a "**severe underestimation of the resource allocation required for this contract.**" AR Tab 50 at 2773 (emphasis in original). The Agency also explained the basis for this finding: "there is not sufficient detail in the offer to explain how the work will be completed," nor an "indication in the proposal that would mitigate [the proposed number of ISSOs], including additional future staffing or a technical solution that would assist with the workload." *Id.*

Plaintiff argues "[e]ven assuming the one negative finding could have brought [the Resource Allocation subfactor] to a Low Confidence rating," the FCC had to equally weigh the [\*\*\*] other "High Confidence" subfactors, which should result in a High Confidence score for all of Factor 3. Pl.'s MJAR at 10. This argument misstates the Solicitation. The Agency did not individually rank each subfactor—there were no "High Confidence" or "Low Confidence" subfactors. *See* Def.'s Reply at 7, ECF No. 49. Therefore, there were no subfactor "scores" to add up and calculate an average.

Instead, AccelGov's staffing weakness emanated through all of Factor 3 and poisoned the rating. The outsized weight of the weakness does not mean the subfactors were considered unequally. *See Enhanced Veterans Sols., Inc. v. United States*, 131 Fed. Cl. 565, 586 (2017). As the "subfactor containing significant weaknesses or deficiencies," Resource Allocation had the most influence on the factor rating—but this would occur "regardless of which subfactor evaluation contained [the weaknesses]." *Id*; *see also In re. Apptis Inc.-Costs*, B-402146.3, 2010 WL 2561522, at \*5 (Comp. Gen. Mar. 31, 2010). ("In our view, the protestor incorrectly assumes that an assessment of weaknesses under one of four equally-weighted subfactors precludes an overall rating of marginal."). By analogy, a stool missing any of its four legs, no matter which leg—and no matter how perfectly the other legs are constructed—is not a functional stool.

Plaintiff stresses that the court in *Enhanced Veterans* found it significant that the agency decided how serious weaknesses would affect factor ratings *before* evaluations were conducted. Pl.'s Resp. at 3 (citing *Enhanced Veterans*, 131 Fed. Cl. at 586). In a footnote, the court noted that "[i]f the [source selection plan] had not prescribed such a methodology, and it was instead adopted by the evaluators after proposals were reviewed, such a practice could potentially rob the ultimate source selection decision of its rationality." *Enhanced Veterans*, 131 Fed. Cl. at 586 n.22. By contrast, the Solicitation in this case did not explicitly state how the FCC would treat serious adjectival weaknesses. *See* Pl.'s Resp. at 4.

But the "methodology" addressed by *Enhanced Veterans* was the "roll-up" of subfactor scores, by which an agency automatically equates an entire factor rating with a single subfactor rating. *Enhanced Veterans*, 131 Fed. Cl. at 585. The "roll-up" method was not possible in the

instant procurement because there were no individual subfactor ratings; instead, the FCC used strengths and weaknesses as subjective guides to determine an overall factor score. Furthermore, other courts have found that an agency may reasonably "roll up" a subfactor rating even when the agency did not previously "provide for the 'roll-up evaluation methodology.'" *Harkcon, Inc. v. United States*, 133 Fed. Cl. 441, 469 (2017) (quoting *Enhanced Veterans Sols.*, 131 Fed. Cl. at 586)).

Significantly, while AccelGov contests its "Low Confidence" Management Approach score, it does not challenge the substance of the decreased confidence finding or defend the sufficiency of its staffing proposal. The Solicitation defined a "Low Confidence" score to mean that "[t]he Government has low confidence that the offeror understands the requirement, proposes a sound approach, or will be successful in performing the work even with Government intervention." Tab 19a at AR 332. AccelGov does not dispute the reasonableness of this finding. And by the terms of this Solicitation, if the assessment of the weakness was reasonable, then so was the award of a low factor score. *See, e.g.*, *In re. Apptis Inc.-Costs*, 2010 WL 2561522, at *5 ("[U]nder the evaluation standards announced in the solicitation, weaknesses relating to an offeror's understanding of the requirements could have reasonably resulted in an overall rating of marginal for the technical approach factor—assuming the agency's assessment of the weaknesses was reasonable."). At bottom, Plaintiff's protest does not overcome the Agency's "great discretion in determining the scope of an evaluation factor." *Tetra Tech, Inc.*, 137 Fed. Cl. at 383 (quotation omitted).

### B.    The FCC's Evaluation Was Not Inconsistent Among Bidders.

AccelGov argues the FCC evaluated the Resource Allocation subfactor inconsistently among bidders. Pl.'s MJAR at 10–11. Plaintiff notes the Agency also gave Argus a decreased confidence finding under this subfactor for staffing issues, but it nonetheless awarded Argus a "High Confidence" Factor 3 rating. *Id.* at 11. AccelGov latches onto the CO's statement that "'this sub-element was not significant enough to lower' Argus's Factor 3 rating from High Confidence." *Id.* (quoting Tab 69 at AR 2984). Plaintiff asserts that this statement proves the Agency based Argus's Factor 3 score on "the equal weight it gave Resource Allocation and other Factor 3 sub-elements, not the substance of the negative finding." *Id.* Citing its own proposal, as well as three other bidders who earned Low Confidence Factor 3 scores due to weaknesses in Resource Allocation, AccelGov concludes the FCC weighed the subfactor "one way for Argus and another way for other bidders." *Id.* at 11, 11 n.3.

This argument fails. Plaintiff is correct that proposals must be "evaluated 'evenhandedly against common requirements and evaluation criteria.'" *Id.* at 10 (quoting *HWA, Inc. v. United States*, 78 Fed. Cl. 512, 516 (2007)). But while "[a]ll contractors and prospective contractors shall be treated fairly and impartially," they "need not be treated the same." 48 C.F.R. § 1.102-2(c)(3). To succeed on a disparate evaluation claim, "a protestor must show that the agency unreasonably downgraded its proposals for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." *Off. Design Grp.*, 951 F.3d at 1372 (citations omitted).

AccelGov's and Argus's Resource Allocation weaknesses are plainly distinguishable. AccelGov proposed an insufficient number of ISSOs, which the Agency concluded was a "**severe underestimation**" of the number needed to handle the job.  Tab 50 at AR 2773 (emphasis in original).  Furthermore, the TET could not find "sufficient detail" in AccelGov's offer "to explain how the work will be completed" or any "indication in the proposal that would mitigate this [weakness], including additional future staffing or a technical solution that would assist with the workload." *Id.*  By comparison, Argus proposed enough ISSOs, but an insufficient number of [***] IR Analysts.  *See* Tab 51 at AR 2785.  The TET concluded Argus's proposal [***] IR Analysts was "more likely to reduce the quality of work," but it raised no concerns about Argus's ability to complete the work.  *Id.*

The ISSO and IR Analyst positions, and the resulting deficiencies caused by understaffing them, are not the same.  The PWS dedicates an entire subsection to the ISSO position that lists eleven distinct roles, including that they will "[a]ssist with reporting and investigating information security incidents to the Cybersecurity Group Security Operations Center," "[p]erform real-time monitoring of assigned information systems," and "[r]egularly review the FCC security posture."  Tab 19c at AR 375.  Offerors knew that ISSOs would be responsible for monitoring up to thirty "FISMA information system boundaries," as well as "approximately 30 minor applications."  Tab 19e at AR 399.  Furthermore, the three higher-ranked bidders all proposed at least [***] ISSOs, which indicates that the importance of the ISSO role was clear to those with experience in the industry.  *See* Tab 35d at AR 775; Tab 37a at AR 1046; Tab 45b at AR 2110.

By contrast, the Solicitation did not dedicate a subsection to the IR Analyst role.  *See* Tab 19c at AR 360–61 (describing "Incident Assessment and Response Support" generally but not outlining IR Analyst responsibilities in their own section).  The incident response work stressed the importance of "detecting and mitigating bot threats within FCC applications."  *Id*. at 360. While this work is no doubt important to the Contract, it is easily distinguished from the system-wide monitoring done by ISSOs.  Therefore, it is reasonable to conclude from the Solicitations' treatment of the two positions that a deficient number of ISSOs is a significantly different kind of weakness than a deficient number of IR Analysts.

AccelGov does not claim that these two roles are indistinguishable, or that the Agency was mistaken about the number of employees needed for each role.  *See generally* Pl.'s MJAR. Regardless, it would be inappropriate for this Court to weigh in on such technical questions. "Technical ratings involve discretionary determinations of procurement officials that a court will not second guess." *Benchmade Knife Co. v. United States*, 79 Fed. Cl. 731, 733 (2007) (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)) (citation modified).   The Agency devoted a full paragraph explaining the information security consequences of both Argus's and AccelGov's staffing weaknesses; it decided the latter were far more significant.  *See* Tab 50 at AR 2773; Tab 51 at AR 2785; *compare* Tab 68 at AR 2968 (explaining that because it "involved [***] IR analysts" rather than "[***]," Argus's resource allocation weakness did not impact its overall Factor 3 rating), *with id.* at 2969 (explaining that AccelGov's underestimation

of ISSOs was a "severe underestimation" and thus "significant enough" to lower its overall Factor 3 rating).  This Court will not second guess that decision.

### C.    The FCC's Best Value Analysis Was Proper.

AccelGov argues that the CO's best-value analysis is insufficient.  Pl.'s MJAR at 12–13.  First, it asserts the FCC erred because it did not compare the winning proposal "to any proposal that had a lower price" or "consider whether Argus's price premium [over AccelGov] was worth the technical advantage."  Pl.'s Resp. & Reply at 8, ECF No. 44 (citing *Serco, Inc. v. United States*, 81 Fed. Cl. 463, 500 (2008)).  It further claims the FCC should have considered any offeror who was eligible for award in the best-value tradeoff analysis.  Pl.'s MJAR at 13 ("AccelGov was eligible for award, so FCC should have considered AccelGov in a tradeoff analysis.").  Doing so would have required explicit consideration in the best value analysis of thirteen additional offerors.  *See* Tab 69 at AR 2982 (listing sixteen offerors total).

The Court disagrees that the CO failed to weigh Argus against any lower-priced offerors.  Although the CO did not mention those bidders explicitly, her tradeoff analysis between the two top-tier bidders and second-tier [***] logically ruled out all lower-ranked vendors.  While [***]'s bid was more expensive than Argus's, it was [***] lower than [***].  Tab 69 at AR 3002.  But the CO wrote that [***] could not overcome its staffing deficiencies versus the two higher-ranked bidders, which included the higher-priced [***].  *Id*.  [***]'s staffing deficiency earned it a Some Confidence rating under Factor 3.  *Id.* at AR 2982.  Every other lower-ranked vendor, including AccelGov, earned a Low Confidence rating under the *same factor*.  *Id.*

The lower-ranked bids therefore presented the same type of problem as [***]'s bid, only more severe.  The CO reasoned that "[h]aving two highest technically [sic] vendors ranked above [***] does not justify awarding to a less technical [sic] favorable offeror."  *Id.*  It is "reasonably discernible" from this statement that she concluded the Low Confidence bids were even less justified by a price advantage than [***]'s Some Confidence bid.  *See DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1313–14 (Fed. Cir. 2021) (quoting *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998)).

Furthermore, the FCC was not required to explicitly consider every offeror in its best-value analysis.  The Solicitation was conducted under FAR Subpart 8.4, and "the requirements for a best value tradeoff under FAR Subpart 8.4 are significantly less than those for FAR Part 15."[2]  *Integrated Fin. & Acct. Sols., LLC v. United States*, 161 Fed. Cl. 475, 495 (2022) (citation modified); *see also Allied Tech. Grp, Inc. v. United States*, 94 Fed. Cl. 16, 50 (2010) ("The very purpose of FAR Part 8 is to provide a more simplified and flexible approach

---

[2] FAR Subpart 8.4 regulates orders placed by an agency under a bidder's Federal Supply Schedules contract with the General Services Administration, which "provides a simplified avenue for federal agencies to procure commercial supplies and services at prices associated with volume buying."  *DevTech Sys., Inc. v. United States*, 176 Fed. Cl. 297, 306 (2025) (citing FAR 8.402(a)).  FAR Part 15 "prescribes procedures for most negotiated contracts" between a bidder and a soliciting agency.  *Id.* (quoting *Coast Pro, Inc. v. United States*, 828 F.3d 1349, 1351–52 (Fed. Cir. 2016)).

away from the more formal and rigorous procedures for negotiated procurements." (citation modified)). The Court analyzes a tradeoff decision under FAR Subpart 8.4 "to determine whether it is reasonable and within the agency's discretion." *Distributed Sols., Inc. v. United States*, 106 Fed. Cl. 1, 24 (2012) (citing *Allied Tech. Grp.,* 94 Fed. Cl. at 50), *aff'd*, 500 F. App'x 955 (Fed. Cir. 2013).

This Court has held that where a CO's decision memorandum evaluates each bid's strengths and weaknesses in detail, it is reasonable under a FAR Subpart 8.4 procurement to "eliminate[] certain quoters due to ratings before comparing the three remaining quoters . . . against each other." *Integrated Fin. & Acct. Sols., LLC*, 161 Fed. Cl. at 496. Such is the case here. The CO thoroughly analyzed the strengths and weaknesses of each bid in eighteen pages of her decision memorandum. Tab 69 at AR 2982–3000. She then considered three bids from the top two tiers. *Id.* at AR 3002.

AccelGov objects that the CO did not go further because "nothing in the Solicitation said that bidders with a Low Confidence rating were ineligible for award." Pl.'s MJAR at 13 n.4. But Plaintiff misconstrues the standard for agency discretion—nothing in the Solicitation *required* the Agency to conduct explicit tradeoff analyses for each bidder, no matter how lowly rated. *See 22nd Century Techs., Inc. v. United States*, No. 21-1137, 2021 WL 3856038, at *12 (Fed. Cl. July 21, 2021) ("Nowhere in the RFQ does it state that each offeror would be evaluated against every other price. Nor did the RFQ require that the Agency had an obligation to do so."). Instead, the Solicitation explained it would choose the offer representing the best value "in accordance with the evaluation factors" and that technical factors were "significantly more important than" price. Tab 19a at AR 332, 336. Under these criteria, the CO acted reasonably by ruling out bids that scored two full technical ratings below the top two offerors.

### D.    AccelGov Cannot Show Prejudice or Obtain a Permanent Injunction.

AccelGov argues it suffered prejudice because, if not for the alleged evaluation errors, it stood a substantial chance of award. Pl.'s MJAR at 13–16. The Court need not reach this issue because Plaintiff has not shown the FCC acted irrationally or contrary to law in its evaluation. *See Bannum, Inc.,* 404 F.3d at 1351.

Likewise, the Court need not address AccelGov's argument for a permanent injunction against continued performance of the Contract. *See* Pl.'s MJAR at 16–18. To succeed on a motion for a permanent injunction, a plaintiff must first succeed on the merits of the case. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). As AccelGov fails on the merits, it cannot obtain a permanent injunction.

## V.    Conclusion

For these reasons, Plaintiff's Motion for Summary Judgment on the Administrative Record, ECF No. 36, is **DENIED**. Plaintiff's Motion for Preliminary Injunction, ECF No. 3, is **DENIED AS MOOT**. Defendant's and Defendant-Intervenor's Cross-Motions for Judgment on the Administrative Record, ECF Nos. 38 and 39, are **GRANTED**. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

<u>s/ Carolyn N. Lerner</u>
CAROLYN N. LERNER
Judge

17